FILED
2020 Feb-26 AM 11:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ALABAMA

## NORTHEASTERN DIVISION

FILED

2020 FEB 26 A 10: 40

U.S. DISTRICT COURT
N.D. OF ALABAMA

**MELVIN RAY,**

    **PLAINTIFF,**


**V.**

                    **CIVIL ACTION NO.**

                    **5:18-CV-1574-CLS-HNJ**

                    **JURY TRIAL DEMANDED**

**LT. DEAUNDRA JOHNSON, et al.,**

    **DEFENDANTS.**


## PLAINTIFF'S MOTION IN OPPOSITION TO THE DEFENDANTS'

## MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS'

## <u>IMMUNITY DEFENSES</u>


**NOW COMES** the Plaintiff, **MELVIN RAY** (herein after **"Ray"),** proceeding *pro se* and hereby submits his motion, affidavit and exhibits, in opposition to the Defendants' *Motion for Summary Judgment*, showing that the Defendants' motion is due to be denied, and offers the following in support:

1

I.

## CAUSE OF ACTION

*"Our infrastructure was not designed to rehabilitate. It was designed to warehouse."*

Jefferson Dunn, *Commissioner of the Alabama Department of Corrections*

Wall Street Journal, *January 26, 2020*

1. Beginning in 2013, the Plaintiff Melvin Ray, who is incarcerated in the Alabama Department of Corrections began writing, speaking and documenting the ongoing humanitarian crises taking place inside of Alabama's prisons, which include corruption by public officials, inhumane living conditions, deaths, suicides, state-actions -policies and -practices that engender violence, and the overall constitutional violations that the incarcerated were being subjected to, and continue to be subjected to on a daily basis.. Since that time, Ray has been interviewed by San Francisco Bay View, BBC, Wall Street Journal, LA Times, Huffington Post, AL.com, Montgomery Advertiser, attorneys from Southern Center for Human Rights, Southern Poverty Law Center,Equal Justice Initiative, and been featured in two short-documentaries, one by Al Jazerra America and the other with HBO/Vice, and many other media outlets concerning these issues. This advocacy work and activism has brought Ray into the cross-hairs of corrupt prison officials and their underlings. Cp. **Pratt v. Roland**, 770 F. Supp. 1399 (N.D. Cal. 1991)(*defendants enjoined from threatening, harassing or punishing the plaintiff because of media attention.*)

2. Many of the issues that Ray has exercised his constitutionally protected rights to speak about have led to or been echoed by others in multiple civil rights lawsuits being filed against ADOC officials for issues ranging from excessive force, violations of the Americans With Disability Act, violations of the rights of the mentally ill, medical abuse and neglect; heightened media and public scrutiny of ADOC operations and corruption by ADOC officials; exposure of the inhumane conditions inside of the ADOC like exposure to rust/corrosion, black mole, asbestos, and health code violations that led to prison closures; forced resignations of Commissioner Kim Thomas, Associate Commissioners James DeLoach and Grant Culliver, Wardens Carter Davenport and DeWayne Estes, others; and, the Plaintiff's claims have been confirmed after

2

investigations by the United States Department of Justice, Southern Poverty Law Center, Southern Center for Human Rights, Equal Justice Initiative, and by the many class action and individual lawsuits that have been filed in the United States District Courts in Alabama, including this Northern District:

### *See, e.g.*

(i) **PLAINTIFF'S EXHIBIT B** , *INVESTIGATION REPORT, APRIL 2, 2019, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISISON, INVESTIGATION OF ALABAMA'S STATE PRISONS FOR MEN. April 2, 2019, the United States Department of Justice, after conducting yet another investigation into Alabama prisons for over two years, conclude in their findings that the conditions inside ADOC violate the Eighth Amendment's proscription against "cruel and unusual."*

*"The Southern Poverty Law Center and others sued Alabama in federal court in 2014 over alleged failures to address the medical and mental-health needs of prisoners. Three years later, U.S. District Judge Myron Thompson found the correctional system's handling of those needs "horrendously inadequate" and criticized severe staff shortages. He later ordered the state to hire more than 2,000 additional correctional staff by 2022.*

*Separately, the Justice Department last year issued the results of its investigation of Alabama's men's prisons, saying conditions there likely violated inmates' constitutional rights. "An excessive amount of violence, sexual abuse and prisoner deaths occur within Alabama's prisons on a regular basis," the report said.*

(ii) **PLAINTIFF'S EXHIBIT C**, *INVESTIGATION REPORT, JANUARY 14, 2014, INVESTIGATION OF THE JULIA TUTWILER PRISON FOR WOMEN AND NOTICE OF EXPANDED INVESTIGATION*;

(iii) **Plaintiff's Exhibit D**, *As Prison Spending Increases, So Does Violence and Misconduct,* EQUAL JUSTICE INITIATIVE Report, November 18, 2019:

*"In the first 10 months of 2019, twice as many Alabama prisoners have been murdered (13) than the entire 10-year period between*

*1999 and 2009, making Alabama's current system the most violent in the nation."*

\*          \*          \*          \*

*"Prison Homicide Rates on the Rise*

*"Between **2000 and 2009** [the year before Davenport arrived at St. Clair] Alabama reported a total of six homicides in its prison system, which houses just over 24,000 people on average. That's an average annual rate of 2.5 homicides per 100,000 incarcerated people.*

***From 2010 to 2019, prison homicides increased tenfold to 60 and the average annual rate is now approximately 62 homicides per 100,000 incarcerated people. This is nearly nine times the national average for state prisons, according to the most recent data available from the federal Bureau of Justice Statistics."***

(iv) Plaintiff Requests the Court to take Judicial Notice of the following class-action lawsuits:

(v) *Braggs v. Jefferson Dunn, et. al., 2:14-cv-00601-MHT-TFM;*

(vi) *Dunn, et. al., v. Dunn, et. al.*, 2:14-cv-00601-MHT-TFM (WO);

(Filings from both actions are attached to this Motion)

## HBO/VICE NEWS INTERVIEW WITH JOURNALIST ANTONIA HYLTON

3. In September 2016, journalist Antonia Hylton of HBO/Vice reached out to Ray requesting the interview that turned into the aforementioned short documentary film concerning these issues.

4. Plaintiff's interview with Ms. Hylton was published online to the HBO/Vice YouTube channel on *October 3, 2016.* Defendants Johnson and Pickens state in their Special Report that they

4

discovered the interview online on the HBO/Vice channel *October 24, 2016*. Defendant Johnson has not disclosed who informed her of this video.

5. By the time that this interview was conducted in September 2016, Plaintiff Ray had already been subjected to a clearly defined pattern and practice of verbal and physical abuse and harassment, retaliation and abuse of the administrative process without due process, **McQueen v. Tabah**, 839 F. 2d 1525 (11th. Cir. 1988), and constitutional rights violations from DOC officials whenever they discovered that the Ray had been speaking to the media about these issues. Plaintiff Ray was subjected to a long list of atypical and significant hardships, which includes being *physically assaulted, food poisoning, and sexually harassed* for speaking about these issues*:*

## *While in these disciplinary segregation units for a period spanning five years (2014-2019), Ray was subject to the following hardships and punishments:*

> *constant cell changes, constraint strip searches and body searches, strip/dry cells, constant verbal and physical abuse and suffered significant physical injury at the hands of ADOC officials, food poisoning that caused permanent damage, property constantly destroyed during, constant transfers and unprecedented cell movements, deprivation of visits, canteen, access to a phone, denied a radio, books and newspapers, attorney visits denied, tampering and interfering with medical orders, stuck into inhumane filth and living conditions inside contaminated cells, denied exercise privileges, denied access to classification services, and more. . In addition, for several years, Ray was restricted to "walk alone" status, in violation of my right to free association, which consisted of being forced to walk totally alone on the walk yard, totally isolated and separated for other men on the walk. Many times, Ray was denied exercise/walk for months at a time.*

6. In addition, while at Donaldson CF, Warden Angela Miree and Captain Jeffery Baldwin solicited a "hit" on Ray's life less than 30 days after the DOJ came to Donaldson to interview many individuals, including the plaintiff, about complaints that had been filed against ADOC officials for human warehousing, inhumane living conditions and practices under a culture of violence and corruption, lack of educational and rehabilitative resources, excessive force, police brutality and other constitutional violations of individuals under their supervision, including these defendants. A demonstration took place outside of the prison on *September 10, 2016*, to protect the plaintiff's life and bring awareness to this "hit." Among the actions that courts have

5

found sufficiently adverse to support a retaliation claim are: **Hudspeth v. Figgins**, 584 F.2d 1345 (4th Cir. 1978)(death threats).

## II. RAY HAS THE CONSTITUTIONALLY PRTOECTED RIGHT TO COMMUNICATE

### WITH THE MEDIA.

> *Pell v. Procunier*, 417 US 817 (1974); *U.S. v. Carmichael*, 326 F. Supp. 2d 1267 (M.D. Ala. 2004); *U.S. v. Carmichael*, 326 F. Supp. 2d 1303 (M.D. Ala. 2004); *Hardwick v. Ault*, 447 F. Supp. 116 (M.D. Geo. 1978)(forbids censorship of criticism of prison conditions).

7. Ray has the constitutionally protected human right to freedom of speech and freedom of expression, and the right to express his thought and ideas to a free press, including on a social media platform. **Ashcroft v. Free Speech Coalition**, 535 US 234 (2002)("As a general principle, the First Amendment bars the government from dictating what we see or read or speak or hear."); **NAACP v. Claiborne Hardware Co.,** 458 US 886 (1982); **Pell v. Procunier**, 417 US 817 (1974); **U.S. v. Carmichael**, 326 F. Supp. 2d 1267 (M.D. Ala. 2004) ("*First, even though the website's content taken as a whole is not at the core of the First Amendment, the site constitutes protected speech[.]"*); **U.S. v. Carmichael**, 326 F. Supp. 2d 1303 (M.D. Ala. 2004); **Hardwick v. Ault**, 447 F. Supp. 116 (M.D. Geo. 1978)(*forbids censorship of criticism of prison conditions*). Despite this clearly established constitutional right, the defendants took retaliatory actions against Ray for giving this interview that was posted on a social media platform . Cp. **Canadian Coalition Against the Death Penalty v. Ryan,** 269 F. Supp. 2d 1199 (D. Ariz. 2003). The retaliatory acts taken by the defendants were along the same pattern and practice that had developed at that time, See, *PLAINTIFF'S* **EXHIBT A**, *AFFIDAVIT OF PLAINTIFF MELVIN RAY* – many of which still exists today -- because they did not like the political views, subject matter, and thoughts that Ray was expressing about the Alabama prison system in this interview with journalist Antonia Hylton of HBO/VICE News in September 2016, *not because Ray had violated Rule 505*. See, *PLAINTIFF'S* **EXHIBT A**, *AFFIDAVIT OF PLAINTIFF MELVIN RAY*.

## III. THE DEFENDANTS ACTS OF RETALIATION WERE IMMEDIATE TO THE TIME THAT THEY DISCOVERED THE NEWS MEDIA INTERVIEW

8. *Defendant's* **Exhibit K**, Doc. 14-11, page 2 of 7, shows that the video interview in question was posted online on **October 3, 2016**. Defendant Johnson stated in her **Answer** to Ray's **Question No. 9** during the prison disciplinary hearing that she did not learn of the HBO/Vice video until **October 24, 2016**, which was three weeks after the fact, and that this same day, October 24, 2016, was "the day I wrote the disciplinary." (See *Defendant's* **Exhibit H**, Doc. 14-8, page 7 of 7, **Question/Answer No. 9**):

> *QUESTION 9: What date was the site and content discovered?*
>
> *ANSWER (Defendant Deaundra Johnson): "The day I wrote the disciplinary."*

The **Incident Report**, *Defendant's* **Exhibit E**, Doc. 15-5, states that Defendant Pickens ordered Defendant Johnson to write the disciplinary report charging Ray with violation of Administrative Regulation 403, Rule 505, Intentionally creating a safety, security or health hazard.

> *"3. The above inmate is being charged by: Johnson, Deaundra L*
>
> *with a violation of the following rule(s):*
>
> *505 – Intentionally creating a security, safety or health hazard*
>
> *"4. Circumstances of the violation(s) are as follows:*
>
> *"You, inmate Melvin ray B/M were discovered to be participating on a social media site by Lieutenant Johnson intentionally crating a security, safety or health hazard."*
>
> *"10/24/2016 Johnson, Deaunda L / Lieutenant."*

Ray's constitutional right to speak to the press or any other source and to have those thoughts and expressions posted on the internet and social media platforms, is clearly established. **Canadian Coalition Against the Death Penalty v. Ryan,** 269 F. Supp. 2d 1199 (D. Ariz. 2003);

*PRISON DISCIPLINARY HEARING*

9. Administrative Regulation 403, Rule 505. Intentionally Creating a Safety, Security or Health Hazard, states as follows:

*(1) Creating a situation that could cause serious impairment to the operation of the institution, (2) harm to self or individuals, or (3) destruction of property.*

10. At the prison disciplinary hearing, Ray submitted specific questions the arresting officer, Defendant Johnson, directed toward each element of Rule 505, showing that, during his interview, Ray **did not** say or do anything that could (1) create any situation that could cause serious impairment to the operation of the institution, (2) harm self or others, or (3) destroy or cause any destruction to property. These specific questions, submitted as *Plaintiff's* **EXHIBIT E,** *Questions 11 through 16***,** proves that the defendants did not present any evidence or attempt to dispute the fact that Ray did not violate any element of Rule 505:

(\*Note. The Defendants omitted these questions from the record when they submitted their Special Report)

> ***Question No. 11****: What specific act was Melvin Ray doing that constitutes "participating on a social media site?"*
>
> ***ANSWER BY DEFENDANT JOHNSON****: "Speaking to a news lady giving an interview."*
>
> ***Question No. 12****: Was Melvin Ray engaging in any activity that could cause destruction of property?*
>
> ***ANSWER: Irrelevant.***
>
> *If yes, please explain or describe the activity. [No response]*

**Question No. 13:** *Was Melvin Ray participating in any activity that could "cause harm to himself or individuals?"*

*ANSWER: Yes*

*If yes, what was the activity? "Only yes or no questions." \*(As will be discussed in Part .V , there is no such requirement in Admin. Regulation 403 that "only yes or no questions" can be asked at a prison disciplinary hearing.)*

**Question No. 14:** *Was Melvin ay participating in any activity that created a situation that caused or could cause serious impairment to the operation of the institution?*

*ANSWER: "Yes"*

*If yes, what was the situation that was created and when was it created?*

*[No response]*

**Question 15:** *Was any other person participating on social media?*

*ANSWER: "Irrelevant."*

**Question 16:** *What was Melvin Ray's participation on the site?*

*ANSWER: "Giving an interview."*

11. During the course of this interview, an online documentary that Ray respectfully requests the court to take judicial notice of, Ray **did not** violate any of the three elements of this Rule 505. Both the prison disciplinary record and the video itself proves that: (1) Ray **did not** make -- and the defendants do not claim that Ray made -- any threats or use threatening language during the course of the interview; (2) **did not** attempt to encourage anyone to take any unlawful or prohibited actions during the interview; (3) **did not** create any situation that could cause serious impairment to the operation of the institution; and (4) **did not** encourage

9

violence, destruction of property or harm to himself or others during his interview with HBO/VICE news. Nothing about what Ray stated can ever be interpreted as threatening to the safety or security of a prison, because there is no threat to be made in exposing dehumanizing, barbaric and corrupt prison conditions that actually exist. **Watts v. United States**, 394 US 705 (1969)(" What is a threat must be distinguished from what is constitutionally protected speech.")

12.  The prison disciplinary record shows that there was no allegation made or evidence submitted to show that Ray was guilty of violating any element Rule 505, and that the purpose of the disciplinary report was to punish Ray for exercising his First Amendment right by giving an interview to the news media. **Ashcroft v. Free Speech Coalition**, 535 U. S. 234, 244, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002); **NAACP . Claiborne Hardware Co.,** 458 US 886 (1992). Defendant Johnson never gave any testimony or other type of evidence to support any element of this charge of intentionally creating a safety, security of health hazard. . In fact, Defendant Johnson refused to answer Questions 12, 13 and 14, which bore directly on their charge. However, Defendant Johnson stated in her opening statement, See *Defendant's* **Exhibit H**, Doc. 14-8, pages 1 of  7, "Arresting Officer's testimony (at the hearing)", Line 13 of the Disciplinary Report., (*Inmate Ray was  conducting  an interview on vice News*" ), and in her answer to Questions 11 and 16  that Ray's act of "participating on social media" consisted of "Speaking to a news lady giving an interview." See, *Plaintiff's* **EXHIBIT E***, sworn QUESTIONS/ANSWERS 11 THROUGH 16 of Defendant Johnson during prison disciplinary hearing*:

> **Question No. 11***: What specific act was Melvin Ray doing that constitutes "participating on a social media site?"*
>
> *ANSWER BY DEFENDANT JOHNSON:* **"Speaking to a news lady giving an interview."**

\*          \*          \*          \*

**Question 16***: What was Melvin Ray's participation on the site?*

*ANSWER:* **"Giving an interview."**

The evidence from the state administrative proceeding and their subsequent actions makes clear that the defendants' intent was to punish Ray for speaking to the media, and to isolate him and keep him detained in in punitive segregation under conditions of confinement that were designed to violate Ray's constitutional and human rights and to impose atypical and significant hardships upon Ray in their coordinated efforts to silence him from exposing the humanitarian crisis taking place in Alabama prisons.

## IV. THE ADMINISTRATIVE DISCIPLINARY HEARING WAS NOT FAIR AND IMPARTAIL

13. In addition, the hearing officer, Defendant Aaron, was NOT fair and impartial, and had made clear that his finding of guilt was already established before the hearing ever began. **Edwrds v. Balisok,** 520 US 641 (1997)(*holding decision of "biased hearing officer who dishonestly suppresses evidence of innocence" cannot stand);* **Patterson v. Coughlin**, *905 F. 2d 564 (2nd zCir. 1990):*

> *"An inmate subject to a disciplinary hearing is entitled to, inter alia, animpartial hearing officer. See, e.g., Wolff v. McDonnell, 418 US 539, 570-571 (1974) Our conception of an impartial decisionmaker is one who, inter alia, does not prejudge the evidence and who cannot say, with the utter certainty advanced by these defendants, how he wuld assess evidence he has not yet seen. See, e.g., Franscis v. Coughlin, 891 F. 2d 43 (2nd Cir. 1989)("it would be improper for prison officials to decide the disposition of a case before it was heard").*

15. When Ray went to the disciplinary hearing, the environment was hostile, threatening and fraught with animosity coming from Defendants Johnson and Aaron. Defendant Aaron interrupted me during my opening statement, before any evidence was presented, and told me that he had already decided to find me guilty and that I could appeal to the warden:

> *"I don't need to hear what the Rule says. I saw the video and it was you speaking, therefore, you are guilty of intentionally creating."*

11

**I responded as follows**:

> "*Then why did you call me to the hearing if you have already decided to find me guilty before hearing my defense? I have a written statement and questions for the arresting officer to establish that I never violated Rule 505 and that I was within my First Amendment Rights at all times.*"

**Defendant Aaron then replied:**

> "*Well, finish your statement, submit your questions, and I am still going to find you guilty. You can appeal to the Warden.*"

*See Plaintiff's* **Exhibit A,** Affidavit of the Plaintiff Melvin Ray.

16. Then, once the hearing started, Defendant Aaron refused to allow Ray to ask many of my questions, including Questions 1, 3, 5, 7, 8, 10, 12, 13, 14 and 15. And, when Ray attempted to develop evidence that Ray was innocent of the charged conduct through Questions 12, 13, 14 and 15, Defendant Aaron made up his own rule stating that I could ask "only yes or no questions", in order to prevent me from proving my innocence. See **Question 13**, *Plaintiff's* **Exhibit E.**

> ***Question No. 13:*** *Was Melvin Ray participating in any activity that could "cause harm to himself or individuals?"*
>
> *ANSWER: Yes*
>
> *If yes, what was the activity?* "***Only yes or no questions.***"

Cf. Adm. Reg. 403, Sec. V. PROCEDURES, 7, d:

*"The inmate must be permitted to prepare and submit to the Hearing Officer pertinent written questions to be asked of the Arresting Officer and witnesses at the hearing."*

17.  When the hearing ended, Defendant Aaron simply stated that he found Ray guilty, without stating any basis for this findings and without stopping to consider the evidence presented as required by Administrative Regulation 403. Defendant Aaron merely entered his *predetermined* decision of guilt and instructed the officers to return me to the segregation unit, contrary to Adm. Reg. 403 procedure:

Admin. Reg. 403, Section B.2.:

(j) *Dismiss everyone from the hearing room for deliberation, and*

*(1) Consider the evidence.*

18. Defendant Aaron's refusal to allow Ray to ask most of his, including his arbitrary manufacturing of a "only yes or no questions" rule were clearly designed to prevent Ray from proving his innocence. **Edwards v. Balisok**, 520 U.S. 641 (1997) (decision of a biased hearing officer who dishonestly suppresses evidence of innocence cannot stand). The court will note that Defendant Aaron did not invoke this "only yes or no questions" rule for any of the other questions submitted by Ray and that it was only when Ray sought to prove that he had not violated any of the elements of Rule 505 did Defendant Aaron attempt this tactic.

19. Furthermore, the *Defendant's* **Exhibits C,** *Affidavit of Defendant Johnson,("I, Lieutenant Johnson immediately reported the incident to Correctional Warden I, Errol Pickens. Warden Pickens instructed me to issue Ray a disciplinary for violation of rule 505 – Intentionally Creating a Security, Safety and or Health Hazard"),* and *Defendant's* **Exhibit B**, *Affidavit of Defendant Errol Pickens,* **("**I approved disciplinary WDCF-16-02240-1, *in which Inmate Ray was charged with rule violation 505[.]"),* proves that Defendant Pickens told Defendant Johnson what charge to write, and then approved his own orders. Cp. **People v. Superior Court**, 230 Cal. App. 3d 1592, Cal. Rptr. 900, 903-04 (1991)(*holding [Warden] who had previously reviewed and*

*classified the charge had acted in a prosecutorial role and due process required he disqualification*); and see, **Patterson v. State**, 880 So. 2d 607 (Ala.Crim.App. 2004):

> *"This Court has repeatedly recognized the right of an inmate to a fair and impartial disciplinary hearing. See Perry v. State, 511 So. 2d 268 (Ala. Crim. App. 1987), and Vick v. State, 448 So. 2d 474 (Ala. Crim. App. 1984). "Members of a prison disciplinary committee must be fair and impartial." Walden v. State, 552 So. 2d 192, 193 (Ala. Crim. App. 1989).*
>
> *In his petition and on appeal, Patterson argues that he was denied due process during the disciplinary proceeding because, he claims, the hearing officer who presided over the disciplinary proceeding, Sgt. Charles Bromley, was also involved in investigating the events forming the basis of the prison disciplinary. After reviewing the record, we must agree.*

20. As already shown above, the punishments imposed against Ray went well beyond what was written on paper, and these punishments were excessive, atypical and significant hardships compared to ordinary incidents of prison life, and beyond the pale of what would be considered appropriate for the charge. **Sandin v. Conner**, 515 US 472 (1995). These punishments extended well over two years in disciplinary segregation, including a transfer to the Restrictive Housing Unit at Limestone Correctional Facility without justification, cause or any written report of reclassification. **Williams v. Fountain**, 77 F. 3d 372, 374 n. 3 (11th. Cir. 1996):

> *"Recently, in Sandin v. Conner,   U.S.  , 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995), the Supreme Court clarified the circumstances in which disciplinary changes in a prisoner's conditions of confinement will deprive him or her of a constitutionally protected liberty interest:*
>
> *States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.*

14

*U.S. at    , 115 S. Ct. at 2300 (citations omitted).*

*The Court in Conner concluded that the sanctions imposed on the inmate in that case did not impinge upon a protected liberty interest. The majority noted that the inmate was sentenced to only 30 days of segregated confinement, the record showed that disciplinary segregation mirrored conditions imposed on inmates segregated for other reasons, and the inmate's disciplinary record was subsequently expunged (thus preventing the offense from affecting his chances of parole).    U.S. at    , 115 S. Ct. at 2300. Even on these facts, however, four Justices would have held that the inmate was deprived of a protected liberty interest.* **Because Williams's sanctions--especially the full year of solitary confinement--represent substantially more "atypical and significant hardships . . . in relation to the ordinary incidents of prison life," we assume that he suffered a liberty deprivation and was entitled to due process."**

*Also see* **Watkins v. Mitchem,** *50 F.3d 485 (Ala.Civ.App. 2010)( In this case, Watkins alleges that he was confined for six months to administrative segregation -- a punishment that potentially constitutes a change in the conditions of his confinement, thereby triggering his due-process rights. Watkins asserts that  punishment was imposed without due process.)*

*21.* In **Wilkinson v. Austin**, 545 US 209, (2005), the United States Supreme Court held that a minimum standard of due process must be meet, including providing a written statement of the grounds for why a person is being sent to a maximum restrictive housing unit, notice and opportunity to be heard, and periodic review of their status. After serving one year of solitary at Donaldson, Ray was transferred and then housed for almost 18 months in an even more punitive environment at Limestone RHU without compliance with any of these due process requirements, due to the pervasive retaliation that he was being subjected to. Also see **Hewitt v. Helms**, 459 US 460 (1983). Once there, in addition to the above-listed conditions that Ray had already been subject to, Ray was further required to wear leg iron, belly chains, and handcuffs whenever he left his assigned cell, including on the visitation yard when visiting with his family. At one time, Ray's then-5 year-old granddaughter was traumatized by the sight of the excessive chains draping from Ray when visitation was finally restored at Limestone.

22. The above-quoted portions of the record prove that the defendants are punishing Ray for "*conducting an interview on HBO/Vice News*", "*speaking to the news lady giving an interview*", and "*giving an interview*" to the media and expressing his political views and comments on matters of public importance to citizens in the State of Alabama and United States concerning the ongoing humanitarian crisis, corruption by ADOC officials, and, among other things, unconstitutional conditions of confinement within the Alabama Dept. of Corrections.

## IV. UNIDSPUTED MATERIAL FACTS

23. It is undisputed that Ray was engaging in constitutionally protected free speech and freedom of expression, and his constitutionally protected right to a free press when he gave the interview to Antonia Hylton of HBO/Vice news. The defendants do not challenge this contention in any of their pleadings.

24. It is undisputed that Defendants Pickens and Johnson initiated the current disciplinary proceedings against Ray on *October 24, 2016*, after Defendant Johnson reported to Defendant Pickens that she had "received information that an inmate from Donaldson was participating on social media." HBO/VICE news had posted an interview with Ray on their YouTube social media platform three weeks prior, on October 3, 2016. ( *Defendant's* **Exhibit E**, *Incident Report*, "*Warden Errol Pickens instructed Lieutenant Johnson to issue inmate Ray a disciplinary for violation of rule #505-Intentionally Creating a Security, Safety and or Health Hazard.*"; *Defendant's* **Exhibit H**, *Disciplinary Report*.)

25. It is undisputed that the Defendants charged Ray in the prison disciplinary report for . . . "*participating on a social media site*", *Defendant's* **Exhibit H**, Doc. 14-8, id., and during here statement at the disciplinary hearing for "*conducting an interview on Vice news*." *(Defendant's* **Exhibit H**, Doc. 14-8, id.)

26. It is undisputed that Defendant Johnson stated under Oath during the prison disciplinary proceedings in her Answer to Question No. 11 submitted by Ray that "*participating on a social media site*" consisted of "*speaking to a news lady giving an interview* (sic)." (See *Plaintiff's* **Exhibit E**, *Question and Answer No. 11* )

16

27. It is undisputed that Defendant Johnson stated under Oath during the prison disciplinary hearing in her Answer to Question No. 16 submitted by Ray that Ray was being punished for "**giving an interview**." (See Plaintiff's **Exhibit E**, Question and Answer No. 16)

28. It is undisputed that Ray did not make – and the defendants do not claim that Ray made – any threats or use threatening language during the course of the interview; did not attempt to encourage anyone to take any unlawful or prohibited actions during the interview; and that Ray did not encourage violence, destruction of property or harm to himself or others during his interview with HBO/VICE news. (See Plaintiff's **Exhibit A**, **Affidavit** of the plaintiff, **Melvin Ray**)

29. It is undisputed that there is not a rule in the Administrative Regulation 403 that states that a person charged with a disciplinary infraction can submit "only yes or no questions." Defendant Aaron fabricated this "rule" during Ray's prison disciplinary hearing to prevent Ray from proving that the charge being brought against him was instituted for the illegal purpose of retaliation.

30. It is undisputed that the Alabama Department of Corrections has only one (1) administrative regulation governing communications with the media, **Administrative Regulation No. 005**, **PUBLIC INFORMATION**, and that this regulation applies to all persons subjected this ADOC Administrative regulation, whether classified as a correctional officer, inmate, etc. (Defendants' **Exhibit O** , Administrative Regulation 005)

31. It is undisputed that Ray was transferred from St. Clair prison to Donaldson prison less than 72 hours after Al Jazeera America contacted ADOC and requested an interview with Ray about prison conditions in Alabama.

32. It is undisputed that Ray served over two years in segregation, one year at Donaldson in disciplinary segregation (August 19, 2016 until August 2, 2017), and then 15 additional months after transfer to Limestone Restrictive Housing Unit (August 2, 2017 until January 9, 2019), after this retaliatory disciplinary was written, even though Ray did not have any disciplinary segregation days and Ray had never been subjected to a reclassification for placement into the State's maximum security restrictive housing at Limestone CF.

33. It is undisputed that the Defendants Pickens and Johnson took retaliatory disciplinary action against Ray for speaking to a member of the media on the same day that the interview was discovered.

34. It is undisputed that ADOC Administrative Regulation 403, Rule 528 is the rule designation for possession of a cellphone, and it is undisputed that Ray was not charged with possession of a cellphone on October 24, 2016, or charged with possession of a cellphone stemming from this incident.

35. It is undisputed that the only sanctions imposed against Ray in the disciplinary proceeding were for 30 days visitation, 30 days canteen, and 30 days phone privilege, but that Ray was continually detained in solitary confinement for appx. two and a half years without cause, without any disciplinary segregation time, and without due process or notice while under atypical and significant conditions of confinement.

## IV. *THE DEFENDANTS ARE NOW TRYING TO CHANGE THEIR STORY FROM WHAT THEY PREVIOUSLY STATED IN THE CERTIFIED ADMINSTRATIVE PRECEEDINGS TO JUSTIFY THEIR RETALIATION*

> **Canadian Coalition Against the Death Penalty v. Ryan,** 269 F. Supp. 2d 1199
> (D. Ariz. 2003)(*The defendants already have a method in place to address possession of a cellphone*)

36. The Defendants now sing a different tune in this civil action. No longer do they contend that Ray was being punished for "*giving an interview to the news lady*", as they stated throughout the prison disciplinary hearing. Now, in their *Special Report* and *Answer*, Defendant Pickens claims that Ray was punished "*not for an interview with the media, but because he used an illegal cellphone to communicate on social media*." See, Document 18, page 5 of 13. The Defendants go on to state in their pleadings that "*Ray was given a prison disciplinary and found guilty of the prison disciplinary, because he was in possession of an illegal cell phone*." Yet, the sworn record from the state disciplinary proceedings are replete with quotations from the defendants stating under Oath that they were taking action against Ray for "*giving an interview*", "*conducting an interview*" and "*speaking to a news lady giving an interview*."

*This was the first time that the word "cellphone" had ever been uttered in these proceedings. The Court can see for itself from the state administrative record that the defendants charged Ray and found him guilty for "giving an interview" "participating on social media", not for possession of a cellphone. In addition, Defendant Pickens does not state which element of Rule 505 – (1) creating a situation that could cause serious impairment to the operation of the institution, or (2) harm to self or individuals, or (3) destruction of property – that Ray allegedly violated by the mere possession of a cellphone that was used to conduct an interview with the media. Plaintiff Ray has posted over 200 videos online over the past six years, all of which these defendants know about and have commented on, and not once has Ray even been charged with "intentionally*

18

*creating a safety, security or health hazard" simply because the videos were filmed with a cellphone. Furthermore, 1000's of phones are confiscated from Alabama prisons every year, and every person found in possession of a phone is charge with "possession" (Rule 528), not intentionally creating (Rule 505). When those of us who are incarcerated and have access to cellphones are not using them to talk about prison conditions and corrupt prison officials, then there is no problem. But when these cellphones are used to talk about prison conditions, then the Defendants want to silence the messenger. Period !!!*

37. The word "cellphone" ***cannot to be found anywhere*** in the disciplinary record or other documents in the defendants' submissions from the state court proceedings. Also, the Court is reminded of the fact that Ray was not found in possession of a cellphone of October 24, 2016, and Ray's cell was not searched on this day trying to find one. Also, Ray was not charged with possession of a cellphone. Instead, Defendant Johnson stated (1) repeatedly throughout the entire prison disciplinary process, (2) in her sworn statement during the prison disciplinary proceeding, and (3) in her sworn answers to questions submitted by Ray, that Ray was being punished for "*speaking to a news lady giving an interview* (sic)", "*conducting an interview on Vice news*", and "*giving an interview.*" See *Plaintiff's* **Exhibit A,** *AFFIDAVIT OF PLAINTIFF, Plaintiff's **EXHIBIT E**, Questions 11 through 16,* and *Defendant's* **Exhibit H,** Doc. 14-8, Page 1 of 7, Line 13. And, it was this act alone that the hearing officer, Defendant Aaron, found Ray guilty and that Defendant Pickens approved Ray's disciplinary report. **Ashcroft v. Free Speech Coalition**, 535 US 234 2002*)("As a general principle, the First Amendment bars the government from dictating what we see or read or speak or hear.")* These new protestations by the defendants are nothing more than a "red herring" that they are attempting in light of the incriminating record from the state disciplinary hearing. The Court should reject this attempt summarily.

38. Additionally, the ADOC has a specific rule for "possession of a cellphone":

> Administrative Regulation 403, Rule 528 UNAUTHORIZED POSSESSION OF A PHONE(S) / ACCESSORY(S)
>
> *- Any communication devise(s), or accessory(s), NOT issued to an inmate by the ADOC. To include, but not limited to, cell phones, cell phone chargers, SIM cards,* land-line phones, link phones, and walkie-talkies.

**Canadian Coalition Against the Death Penalty v. Ryan,** 269 F. Supp. 2d 1199 (D. Ariz. 2003)(*The defendant has a method in place to address possession of a cellphone*)

39. *Defendant's* **Exhibit D**, *Classification Inmate Summary,* **Doc. 14-4**, *page 2 of 3*, their own records shows that on ALL prior occasions – four times – that Ray was alleged to be in possession of a cellphone, he was charged for "Possession of a Phone/Accessory." See:

(1) **Seq. 26**. Rule 528 – UNAUTHORIZED POSSESSION OF A PHONE(S) / ACCESSORY(S),

(2) **Seq. 23**. Rule 528 – UNAUTHORIZED POSSESSION OF A PHONE(S) / ACCESSORY(S),

(3)**Seq. 21.** Rule 528 – UNAUTHORIZED POSSESSION OF A PHONE(S) / ACCESSORY(S),

(4) **Seq. 18.** Rule 528 – UNAUTHORIZED POSSESSION OF A PHONE(S) / ACCESSORY(S),

40. Moreover, neither this plaintiff nor any other person that this plaintiff knows of, has ever been charged with intentionally creating a safety, security, or health hazard solely for a cellphone, even when found in actual possession of the cell phone. The administrative rule requires additional and specific acts before the charge of *intentionally creating* can be sustained. The Defendants give several examples of instances when a person can use a cellphone to commit acts that could create a safety, security, or health hazard: (1) contact a witness in an attempt to intimidate them into changing their testimony, (2) calling family members to request blackmail money, as a bargaining tool. However, the Defendants do not contend that Ray committed any such act – ever !!!

41. Ray's evidence to this Honorable Court shows that it is the subject matter of Ray's interviews and speech and his political views, which have cast a light on the corruption within the ADOC by officials like these Defendants, that caused the Defendants to retaliate against Ray with this disciplinary infraction and take excessive and abusive punitive acts of punishment against Ray. For example, the sanctions imposed against Ray in this disciplinary proceeding were as follow:

a) "Loss of Canteen privileges for 30 days"

b) "Loss of Telephone privileges for 30 days"

c) "Loss of visitation privileges for 30 days"

*Defendant's* **EXHIBIT H,** *Disciplinary Report*, **Doc. 14-8**, Page 1 of 7.

42. However, the actual sanctions that Ray was subjected were quite different, and lasted for over two years, and included much more than simple loss of privileges.

## V. ATYPICAL AND SIGNIFICANT HARDSHIPS, PUNISHMENT AND ABUSE THAT RAY HAS BEEN SUBJECTED TO

> **Crawford-El v. Britton**, 523 US 574 (1998)("*The reason why retaliation offends the Constitution is that it threatens to inhibit exercise of the protected right.*"); **Farrow v. West**, 320 F. 3d 1235 (11ᵗʰ. Cir. 2003); **Mitchell v. Farcass,** 112 F. 3d 1483 (11ᵗʰ. Cir. 1997)(*holding allegation that plaintiff was placed in segregation after complaining to the NAACP stated a claim*).

43. First and foremost, Ray was held for over two years in punitive solitary confinement, one year was served in the punitive disciplinary segregation unit at Donaldson CF, then Ray was transferred to the statewide maximum security Restrictive Housing Unit at Limestone CF for another 17 months, all without any due process, notice or hearing explaining why Ray was being held in disciplinary segregation without any disciplinary segregation days or reclassification to maximum security at the RHU. While in these disciplinary segregation units, Ray was subject to the following hardships and punishments:

> *constant cell changes, constraint strip searches and body searches, strip/dry cells, constant verbal and physical abuse and suffered significant physical injury at the hands of ADOC officials, food poisoning that caused permanent damage, property constantly destroyed during, constant transfers and unprecedented cell movements, deprivation of visits, canteen, access to a phone, denied a radio, books and newspapers, attorney visits denied, tampering or interfering with medical orders, stuck into inhumane filth and living conditions inside contaminated cells, denied exercise privileges, denied access to classification services, and more. . In addition, for several years, Ray was restricted to "walk alone" status, in violation of my right to free association, which consisted of being forced to walk totally alone of the walk yard, totally isolated and separated for other men on the walk. Many times, Ray was denied exercise/walk for months at a time.*

Among the actions that courts have found sufficiently adverse to support a retaliation claim are: **Hudspeth v. Figgins**, 584 F.2d 1345 (4ᵗʰ Cir. 1978)(death threats); **Millhouse v. Carlson**, 652 F.2d 371 (3ʳᵈ Cir, 1981)(conspiratorially planned disciplinary actions); **Madewell v. Roberts**, 909

21

F.2d 1203 (8th Cir. 1990)(blocking reclassification opportunities); **Walker v. Thompson**, 288 F.3d 1005)(7th Cir. 2002)(denial of out-of-cell exercise); **Purkey v. CCA Dentention Center**, 339 F. Supp. 1145 (d. Kan. 2004)(harassment, threats, placement in segregation, scattering and disassembling of papers, denial of visits with wife, confiscation of legal material); **Franklin v. Murphy**, 745 F.2d 1221 (9th Cir. 1984)(claim that prison hospital ordered other inmates not to associate with plaintiff and threatened to punish plaintiff for association arguably stated a claim for denial of freedom of association.)

## OTHER PERSONS INCARCERATED IN ADOC HAVE ALSO SPOKEN OUT AGAINST THE HUMANITARIAN CRISIS IN ALABAMA PRISONS, AND THEY HAVE ALSO BEEN RETALIATED AGAINST

44. Also, Ray is not the only person speaking out concerning these issues, and Ray is not the only person being retaliated against. Kenneth Traywick is yet another individual being retaliated against for exercising his rights to free speech and free press concerning the issues taking place in Alabama prisons. See *Plaintiff's* **Exhibit F,** *'I will not be silent': Alabama Prisoner alleges retaliation after speaking to media*, by Melissa Brown, Montgomery Advertiser, September 11, 2017. The ADOC has a well-documented history of using their corrections officers to utilize their authority and administrative rules to retaliate against people in their prison who speak publicly about prison conditions. See *Plaintiff's* **Exhibit G,** *'American horror story': The prison voices you don't hear from have the most to tell us*, by Melissa Brown, Montgomery Advertiser, Nov. 15, 2019. Though Ray's retaliation has been ongoing for over five years, the disciplinary report in this matter is one of the rare instances that Ray obtained direct proof of the parties' intentional acts. **Crawford-El v. Britton**, 523 US 574 (1998)("*The reason why retaliation offends the Constitution is that it threatens to inhibit exercise of the protected right."); **Farrow v. West**, 320 F. 3d 1235 (11th. Cir. 2003); **Mitchell v. Farcass,** 112 F. 3d 1483 (11th. Cir. 1997)(*holding allegation that plaintiff was placed in segregation after complaining to the NAACP stated a claim*).

## VI. **PROOF OF RETALIATION DEFENDANTS' ACTIONS HAS A CHILLING EFFECT ON THE EXERCISE OF FREEDOM OF SPEECH AND EXPRESSION, AND ACCESS TO A FREE PRESS WITHOUT FEAR OF REPURCUSSION.**

> **Crawford-El v. Britton**, 523 US 574 (1998)("*The reason why retaliation offends the Constitution is that it threatens to inhibit exercise of the protected*

22

*right.");* **Farrow v. West**, 320 F. 3d 1235 (11th. Cir. 2003); **Mitchell v. Farcass,** 112 F. 3d 1483 (11th. Cir. 1997)(*holding allegation that plaintiff was placed in segregation after complaining to the NAACP stated a claim*).

45. The ADOC started their retaliatory actions against Ray in January 2014, when Ray was placed into solitary confinement for exercising his First Amendment rights to free speech and free press and peaceful assembly, in response to rapidly deteriorating conditions inside of Alabama prisons that were leading to deaths, beatings, drugs overdoses, corruptions and other crimes of moral turpitude that were either being facilitated by ADOC prison officials, committed by ADOC officials, encouraged by ADOC officials, or ignored by ADOC officials. **See,** *Plaintiff's* **Exhibit H,** *Prison Secrets: AL.com investigation finds prison bosses have little to fear from breaking the rules,* by Conner Sheets, June 13, 2014:

> **"*An AL.com analysis of hundreds of personnel documents shows that the state's wardens can flout the rules, take a slap on the wrist, return to work or transfer to other prisons. In fact, some wardens were promoted to their positions even after serving suspensions as lower-ranking officers for beating inmates or covering up beatings.*"**

ADOC officers, including the former Associate Commissioners Grant Culliver and James DeLoach, and Warden Carter Davenport, DeWayne Estes, and Cedric Specks, Lt. Willie M. Burke, Sgt. Ulysses Oliver, Lt. Ronald Carter, Lt. Michael Anthony Smith, Scottie Glenn, Matthew Davidson, Officer Gunn (Donaldson CF), Officer Watts (St. Clair), and Jospeh Sanders, among many others, have been fired in the past few years for corruption and ethics violations, engaging in criminal activity, excessive force, incompetent leadership, sexual harassment and misconduct, and more. See *Plaintiff's* **Exhibit D,** Equal Justice Initiative REPORT, *As Prison Spending Increases, So Does Violence and Misconduct,* Nov. 18, 2019..

46. The January 14, 2014, report issued by the United States Department of Justice concerning Tutwiler Prison for Women details over two decades of sexual abuse, rapes, sexual assaults, impregnation and illegal births and abortions at the hands of corrections officers at **Tutwiler** Prison for Women and a culture of retaliation by ADOC officers when citizens under their exclusive supervision, custody and care report their corruption and criminal conduct. *Plaintiff's*

**Exhibit C,** *supra*. Before these women started complaining to the media and writing letters to the Department of Justice, the ADOC was covering up these criminal acts. At the same time, as also reflected in **Exhibit C**, ADOC retaliated against these women for complaining about their abuses and were placed into solitary confinement just like Ray was. The ADOC has a well-documented history of having a culture of isolation and retaliation against incarcerated individuals who dare to exercise their constitutional rights to speak publicly about the ADOC. Of note is that not a single ADOC official was held accountable for their actions at Tutwiler. Also, as will be shown below, some of these officers went on to receive promotions and cause more problems within ADOC – without consequence.

47. Warden Carter Davenport was one of the principal corrections officers involved in these criminal activities at Tutwiler prison, where he served in multiple capacities, including as captain. By 2009, Carter Davenport was promoted to Warden III at St. Clair prison by Associate Commissioner Grant Culliver. Once he arrived at St. Clair prison, the conditions began to deteriorate rapidly and become extremely dangerous. Stabbings increased, officer assaults increased and the severity and brutality of these assaults increased. Rehabilitation and education programs, including religious services were discontinued, and deaths increased. **See,** *Plaintiff's* **Exhibit H,** *Prison Secrets: AL.com investigation finds prison bosses have little to fear from breaking the rules,* by Conner Sheets, June 13, 2014**.**

> *"The number of reported assaults at St. Clair has more than quadrupled since Davenport arrived. There were 101 reported assaults in the prison last year[2013]; there were 23 in 2010."*

Ray was one of many individuals who became concerned about the rapidly deteriorating and increasingly dangerous conditions at St. Clair and began to grieve about same – all to no avail. Finally, Ray began to make his comments directly to the public and the media.

48. By this time, St. Clair prison had went from being the least violent maximum security prison in the State of Alabama and one of the least violent overall prisons, to the most dangerous, violent, and murderous prison in the entire United States. *Plaintiff's* **Exhibit T**, Dead body hanging after committing suicide, *Plaintiff's* **Exhibit U,** *Rocrast Mack beaten to death by ADOC correctional officers*, and *Plaintiff's* **Exhibit V and W**, Photos of the many deaths by murder, suicide, drug overdoses, and officer beatings, in 2019. And these issues were beginning to spread to other prisons and continue on to this day. Associate Commissioner Grantt Culliver and Warden Carter Davenport were at the forefront of these deteriorating conditions, and also at the forefront of the cover-up and retaliation, and these defendants took an active role in the conspiracy to retaliate against Ray once he was transferred to Donaldson CF. For exercising his

24

First Amendment rights, Ray would spend almost the next five consecutive years in disciplinary segregation in effort to silence him, most of the time with no disciplinary sanctions or segregation time, no due process, and no access to classification review.

## VII. AMOUNT OF TIME THAT RAY HAS SPENT IN DISCIPLINARY SEGREGAGTION OR MAXIMUM SECURITY RESTRICTIVE HOUSING UNIT OVERE THE PAST FIVE YEARS FOR SPEAKING ABOUT CONDITIONS INSIDE OF ALABAMA PRISONs AND THE PUNISHMENT ADMINISTERED

49.

   a). January 3, 2014 until February 16, 2016 (25 months, 13 days)

   b). March 31, 2016 until April 25, 2016 (26 days)

   c). August 19, 2016 until October 25, 2018 (26 months, 6 days)(remained in population one week)

   d). November 1, 2018 until January 9, 2019) (2 months, 8 days)

   e). March 19, 2019, until April 3, 2019 (15 days)

   (d) Constant cell changes, constraint strip searches and body searches, strip/dry cells, constant verbal and physical abuse and suffered significant physical injury at the hands of ADOC officials, food poisoning that caused permanent damage, property constantly destroyed during, constant transfers and unprecedented cell movements, deprivation of visits, canteen, access to a phone, denied a radio, books and newspapers, attorney visits denied, tampering and interference with medical orders, stuck into inhumane filth and living conditions inside contaminated cells, denied exercise privileges, denied access to classification services, and more. . In addition, for several years, Ray was restricted to "walk alone" status, in violation of my right to free association, which consisted of being forced to walk totally alone of the walk yard, totally isolated and separated for other men on the walk. Many times, Ray was denied exercise/walk for months at a time.

50.  Grant Culliver was instrumental in orchestrating the actions of ADOC employees at multiple prisons as it related to Ray, including the defendants at Donaldson named in this action. Grant Culliver spent over 15 years as a corrections officer at Donaldson prison. Donaldson prison has a notorious history of officer assaults, officer beatings and murder at the

hands of corrections officers, *See Plaintiff's* **Exhibit J,** *John Hicks, James Taylor, Charles Malec, and Gregory Wynn, Plaintiffs, v. Gary Hetzel, Warden, Richard Allen, Commissioner, Bob Riley, Governor, Defendants, 2:09-cv-155 TMH,* Class Actions. Ray was sent to Donaldson with the purpose of being silenced forever. As recent as August 2019, Stephen Davis was the latest person beaten to death by Donaldson officers. See *Plaintiff's* **Exhibit R,** *By Beth Shelburne, Investigative Reporter, Campaign For Smart Justice,* Nov. 22, 2019. As stated by the defendants in their Answer, Ray was ordered sent to Donaldson by Culliver, and while there, Warden Angela Miree and Captain Jeffery Baldwin put a "hit" on Ray's life. Officers at Donaldson, including all three of the defendants named in this action, have been named in several lawsuits, for use of excessive force, falsifying state documents, and putting out "hits", among other allegations of criminal activity, on individuals incarcerated at Donaldson. See, *Plaintiff's* **Exhibits K,** *Devin Demone Hill, plaintiff, v. Sgt. Jenkins, Officer Watt, Officer Cook, Lt. Peterson, Warden Bollin, and Commisioner Dunn, Defendants,* CV-16-CO-0491-5, United States District Court, Northern District of Alabama.

51. By the time Ray was transferred to Donaldson in August 2015, the public comments and testimonies by citizens in Alabama prisons were being reported in the media almost daily. Both Davenport and Culliver were embroiled in ethics violations, sexual harassment claims, use of force claims and corruption. Both Culliver and Davenport were ultimately forced into resignation due to their criminal or corrupt activity. Davenport was forced to resign after he was transferred to Holman prison and less than 45 days on the job, Davenport provoked multiple riots, including one where he was stabbed multiple times. See, *Plaintiff's* **Exhibit M,** *"Warden of notorious Holman prison retired three months after being stabbed by inmate",* Conner Sheets, September 28, 2016. Ray exercised his right to free speech to comment extensively on these and other events that were needlessly risking violence and potential deaths, where the Commissioner's Office was complicit in covering-up, and putting out false media reports about events happening in the prisons. Culliver, as Associate Commissioner, was cited for having inappropriate sexual relations with yet another secretary, ethics violations, investigation for stealing funds, and covering up all manner of criminal activity in ADOC. *Plaintiff's* **Exhibit L,** *APR* Report.

52. By 2016, the issues affecting Alabama prisons were being reported on nationwide. Also , a nationwide peaceful demonstrations was set to take place in September 2016 concerning criminal justice and prison reform.  HBO/VICE News journalist Ms. Antonia Hylton reached out to Ray for an interview concerning the issues being raised by men and women incarcerated in Alabama prisons, and to speak to the broader issues taking place around the nation. ADOC

26

officials had already taken punitive actions against Ray by placing him in solitary confinement in August 2016 after their plans for a "hit" were f oiled, in efforts to silence Ray from these national conversations. These conversation included issues allegations of human rights abuses, torture, abuse of the mentally ill and inadequate healthcare care, racial disparities in sentencing and the criminal justice system, unconstitutional conditions of confinement, murders, rapes, drug overdose deaths, suicides, corruption and ethics violations by Alabama prison officials, and more. ***Farmer v. Brennan**, 511 U.S. 825, 832, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994)("Although the United States Constitution does not require comfortable prisons, neither does it permit inhumane ones.")* Ms. Hylton posted this interview on the HBO/VICE news social media platform on October 3, 2016. Approximately three weeks later, on October 24, 2016, Defendant Johnson states that she learned of the interview and reported it to Defendant Pickens. Thereafter, Defendant Pickens instructed Defendant Johnson to write Ray a disciplinary for violation of Rule 505 on the same day. *Defendant's* **Exhibit E,** *Incident Report*, *Doc. 14-5.*

## VIII. RAY'S TRANFERS WERE IN RETALIATION FOR AND WERE IN DIRECT

## PROXIMITY IN TIME AND CIRCUMSTANCE TO RAY EXERCISING HIS FIRST AMENDMENT

## RIGHTS TO FREE SPEECH, FREEDOM OF EXPRESSION, AND FREE PRESS

53.  The Defendants claim that *"In this case, it would appear that Ray was transferred because they could not find a bed for him at St Clair",* and *"Even, if arguendo, Inmate Ray was transferred due to the media request, the transfer was at the request of Warden Culliver, not any of the named defendants,."* See **Special Report**, Document 14, Page 9 of 13. The defendants then cite authority for the proposition that Ray does not have a constitutional right to be housed at any particular prison. However, the defendants do not contest Ray's allegation that he was transferred from Donaldson to Limestone in retaliation. Moreover, the Defendants' defense of blaming Culliver for his transfer from St. Clair to Donaldson merely strengthens Ray's claim that he was being subjected to a pattern of retaliation that had went from prison to prison, and that these defendants are now complicit for the acts of their co-conspirators, which, apparently, includes Grant Culliver, a disgraced former commissioner who was forced out for using state property to engage in illegal sexual activity, among other reasons. See **Bridges v. Russell**, 757 F. 2d 1155 (11th. Cir. 1985)(*allegation of transfer in retaliation for a petition stated a claim*.)

While it is true that Ray does not enjoy any right to be housed in any particular prison, Ray does have a protected liberty interest in not being retaliated against by ADOC correctional officers or a state agency for exercising his right to freedom of speech and expression, to a free press and to peacefully assembly. Ray was transferred from St. Clair prison to Donaldson and then from Donaldson to Limestone, in retaliation for exercising these rights. **Cain v. Lane**, 857 F. 2d 1139 (7th Cir. 1988)(*discipline for trying to document inmate complaints about conditions stated a First Amendment claim*).To state a first amendment claim for retaliation, a prisoner need not allege violation of a separate and distinct constitutional right. **Thomas v. Evans**, 880 F.2d 1235 (11th Cir. 1989):

> *"By way of analogy, in Bridges v. Russell, 757 F.2d 1155 (11th Cir. 1985), we held that a prisoner stated a claim of retaliation based on the prisoner being transferred to another facility even though prisoners do not have a liberty interest in remaining at a particular facility. The gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech. The penalty need not rise to the level of a separate constitutional violation"*

54. At the time of Ray's transfer from St. Clair to Donaldson in August 2015, Ray had been confined to solitary confinement for almost 19 months, even though for most of that time Ray did not have any disciplinary segregation and Ray had not been re-classified to administrative segregation status. Indeed, Ray was confined for most of that time in disciplinary segregation, NOT ADMINISTRATIVE SEGREGATION. During that time period, the defendants released hundreds of people back to segregations who, like Ray, had completed all of their disciplinary and administrative segregation time.

> *To proceed on a claim of retaliation and withstand the entry of summary judgment, an "inmate must establish . . . these elements: (1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the [defendants'] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008); Thaddeus-X v. Blatter, 175 F.3d 378, 397 (6th Cir. 1999). With respect to the causal relationship element, a prisoner must demonstrate that correctional officials intended to retaliate for his exercise of a right protected under the First Amendment and, but for the*

28

> retaliatory motive, the adverse act complained of would not have occurred.
> Woods, 60 F.3d at 1166; Smith, 532 F.3d at 1278.

55. Ray was being confined in solitary confinement by Warden Carter Davenport and Grant
Culliver, among others, in retaliation for exposing conditions in ADOC. When Davenport was
transferred to another prison due to his corruptions, abuse of authority, and because of the
incessant protests and exposure of his misconduct that was becoming a problem for ADOC,
etc., the next warden to inherit the leadership post at St. Clair was DeWayne Estes. Warden
Estes continued the ADOC policy of retaliation against Ray and refused to release Ray from
segregation, while refusing to provide any review or classification decision to justify holding Ray
in segregation.

[Note: **Warden Estes was also forced into resignation when incarcerated individuals at
Limestone prison exposed to the media a clandestine "bucket detail" operation that was
inhumane, cruel and unusual, sadistic and sexually reprehensible**. See Plaintiff's **Exhibit S,** "4
days in chains, 3 bowel movements in a bucket: Alabama inmate 'dehumanized' by contraband
search", Andrew J. Yawn, Montgomery Advertiser, may 24, 2019

56. The defendants claim that Ray was transferred because no bed they could not find a bed at
St. Clair in incredulous. As stated above, Ray was held in solitary confinement for almost 20
months before transfer. It is untenable to suggest that no bed could be found in 20 months'
time. In addition, when Ray was transferred to Donaldson, he remained in solitary confinement
for an additional 8 months. During this time, the ADOC found bed space for people who had
went to lockup for murder, stabbings, rape, assault, drug possession, possession of phones, and
all other manner of violation. Once at Donaldson, Ray continued to be transferred from one
segregation cell to another, over and over again in a highly unusual and unprecedented pattern
that was designed to send a clear message.. See Defendant's **Exhibit P,** Doc. 14-16, Pages 1-10,
Bed Movement.

   **Ray's transfer from St. Clair to Donaldson was motivated by one thing: in August 2015, Al
Jazerra News America contacted the ADOC public information office requesting an interview
with Ray about the conditions at St. Clair prison and the attack that had been taken out again
Ray by ADOC officers (add photos). Less than 72 hours after this request for an interview, Ray
was transferred to Donaldson CF in the middle of the evening, on a transport van by himself,
and immediately placed into yet another solitary confinement cell at Donaldson.**

57. At some point in either 2015 or 2016, the United States Department of Justice had starting
paying attention to the information that was being reported out of Alabama prisons and had
begun investigating this information. In June 2016, the US Department of Justice went to

Donaldson prison and interviewed several individuals, including Ray. The investigator informed Ray that he had viewed all of the video content Ray had filmed about conditions inside ADOC. Less than 30 days after this interview, the warden and a captain at Donaldson put out a hit on Ray's life. When this hit was unsuccessful, Ray was then placed into disciplinary segregation on August 19, 2016, for the frivolous charge of failure to obey a direct order, in efforts to mute and isolate Ray. When the HBO interview surfaced, the defendants immediately retaliated.

58. Next, in June 2017, the Department of Justice returned to Donaldson and requested to speak to Ray again after the hit that was put out by Warden Miree and Captain Baldwin had surfaced. In July 2017, Ray wrote an article about the brutality that was taking place at Donaldson and the hit. *Plaintiff's* **Exhibit Q,** *Donaldson Revealed,* by Bennu Hannibal Ra-Sun, August 2016. An ADOC officer told Ray point blank that the staff at Donaldson was retaliating against him and were wrong for punishing Ray for speaking the truth about what was taking place in ADOC. Less than one month after Ray posted one of the articles listed in *Defendant's* **Exhibit N,** *Doc. 14-14*, libcom.org, and less than 45 days after the DOJ visit, Ray was transferred to Limestone Restrictive Housing Unit, even though Ray did not have any disciplinary infractions and Ray had never been classified to be sent to the most restrictive and oppressive unit in Alabama.

59. These transfers and related atypical and significant deprivations (see **ATYPICAL AND SIGNIFICANT HARDSHIPS, PUNISHMENT AND ABUSE THAT RAY HAS BEEN SUBJECTED TO**, infra) and constitutional violations were all almost simultaneous with Ray speaking to the media and releasing public statements about the unbelievable conditions and incompetent leadership in Alabama prisons.

## IX. RAY WAS DENIED EQUAL PROTECTION UNDER THE LAW FOR

## SPEAKING OUT TO THE NEWS MEDIA

60. The ADOC has only one administrative regulation covering the protocols for communications with the media, **Administrative Regulation  005, PUBLIC INFORMATION.** *Defendant's* **Exhibit  M,** *Doc. 14-13, pages 1-15*. This regulation sets out the procedures to follow for officers, incarcerated individuals, and other personnel when communicating with the media or the public. Defendants' cite *Boxer X v. Donald*, 169 F. App'x 555 (11th Cir. 2006), which states, in part:

"In order to establish an equal protection claim, [Inmate Ray] must demonstrate that (1) 'he is similarly situated to correctional officers that received more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest . . ."

61. Because **AR 005** applies to Ray and corrections officers and ADOC staff alike, Ray is similarly situated as corrections officers, ADOC personnel and any other person when it comes to Adm. Reg. 005. However, when the issues affecting Alabama prisons exploded into the media, officers, incarcerated citizens and others went on record to the media and spoke publicly about the conditions going on inside of Alabama prisons. Yet, the ADOC targeted, retaliated against, and punished only its incarcerated citizens for exercising their/our right to speak freedom of speech and freedom of press. ADOC did nothing to the officers and other personnel who also spoke to the media and took other constitutionally protected peaceful actions. See, e.g., Smith v. Fla. Dept. of Corr., 375 Fed.Appx. 905 (11th Cir. 2010) and Smith v. Fla. Dept. of Corr., 713 F.3d 1059 (11th Cir. 2013) (applying Bennett to the context of prisoners who alleges an adverse action by their jailors in response to grievances about terms or conditions of imprisonment).

62. One instance of unequal treatment can be found in the social media posts by Correctional Officer Brian Fife. *Plaintiff's* **Exhibit N**, *Facebook post by Brian Fife*. Officer Fife not only posted comments about ADOC prison conditions online, but he also made threatening, derogatory and homophobic comments that violated multiple ADOC regulations, including Adm. Reg. 206, which prohibits harassment and discrimination:

> *"The best place to start is to address the image the news media and the inmates (along with supporting family members) who run the ignorant Free Alabama Movement group. It must be noted they are the voice of the minority. And this minority are the thugs and chronic problem creators of our institution. They are the ones who do not wake up each day looking to improve upon themselves or help their fellow man, look to respect authority, or in any way create a positive atmosphere. They are the ones who walk around feeling entitled, refusing to listen to basic, simple direction. They can hardly respond to an officer without an attitude, swearing, or racial slurs. They are the ones who only know how to lie and manipulate to get what they want. Their number one priority of the day is trying to find out what they can suck out of the system for themselves, to trade coffee balls for honey buns,* ***cigarettes for a blow job****, steal and lie and act like wannabe gangsters.* ***Yes,***

31

*you read that right. Your brothers, sons and boyfriends and husbands have
sex with each other in there. And they love it. Cause they are sick. "*

Fife also violated the media policy, *Plaintiff's* **Exhibit O**, *Support/Contract Employee
Orientation Agreement Form* by speaking about people in the prison system and
policies, personnel, etc. Several other corrections officers and ADOC officials
commented on this social media post, but ADOC took no actions against any of the
ADOC staff and officials. Yet, no adverse action or discipline was taken by ADOC,
contrary to the actions taken against Ray, Traywick and others.

63. In another instance, when the corrections officers at Holman took part in the peaceful
demonstrations to highlight the inhumane conditions, lack of concern from the commissioner's
office, and the violence in the prisons by participating in a work strike, *Plaintiff's* **Exhibit P,**
*Alabama prison guards went on strike, Department of Corrections  confirms,* by Conner Sheets*,
September 27, 2016,* the ADOC took no action against these officers for engaging in this
peaceful assembly, while ADOC took punitive actions, including arbitrary and sadistic use of
solitary confinement, along with excessive depravations, to punish Ray and other incarcerated
citizens. The officers made multiple public statements to the press expressing their reasons for
engaging in peaceful assembly in violation of the protocols of **Administrative Regulation 005**,
and none were disciplined – but Ray was.

64.  Ray was targeted, retaliated against with solitary confinement, mental and physical abuse,
and many other punishments and restrictions as listed above, for over five consecutive years,
and which continue on to this day. Other incarcerated individuals are being subjected to the
same forms of punishment as Ray. Nevertheless, these punishments are reserved exclusively
for the incarcerated, even though the same administrative regulation governs all of our
conduct. The ADOC, however, is allowing officers like CO I Fife to make derogatory,
homophobic and other offensive comments and conduct media interviews, without
consequence, so long as that narrative is negative to the incarcerated individuals and beneficial
to the narratives and propaganda being put out by the ADOC.

## CONCLUSION

65. There are many genuine issues of fact still in dispute in this matter. The defendants have given two different accounts as to why they took action against the plaintiff on October 24, 2016. In the state disciplinary proceeding, the defendants stated that they were taking action because the plaintiff was conducting an interview with journalist Antonia Hylton of HBO/Vice news. Now, in these proceedings, the defendants claim that they took those actions because the plaintiff was using a cellphone. In addition, the defendants deny that the constant transfers of the plaintiff were retaliatory, yet the defendant offer no evidence justifying their actions, while the plaintiff has submitted overwhelming proof that he was being retaliated against, punished, assaulted by ADOC officials, and denied basic human and constitutional rights, including having a hit put out on his life, for exposing a humanitarian crisis inside of Alabama prisons that ADOC officials, including these defendants, were complicit in, covering-up, and causing endless suffering and deaths by human beings in their custody. This record shows an undeniable record of a pattern and practice that was coordinated by multiple ADOC officials to try to silence this plaintiff. Divine Providence and the Universal Laws of Nature have had the final say in this matter, and all that awaits is for this Honorable Court to render justice and deny the defendants motion for summary judgment and thereafter, set this matter for trial.

**WHEREFORE,** the premises considered, Ray prays that this Honorable Court will issue and Order Denying the Defendants' Motion for Summary Judgment and set this matter for further proceedings as authorized by law and the Court deems just and fair to vindicate the plaintiff's constitutional and human rights and civil liberties.

Respectfully submitted,

_____

Melvin Ray

St. Clair CF

1000 St. Clair Rd

Springville, Ala  35146

33

CERTIFICATE *OF SERVICE*

I certify that I have this 3rd day of February, 2020, cause a copy of this Motion in Opposition to be served upon the Defendant, via US mail, postage prepaid first class delivery, by placement of same into the prison mailbox for legal mail and properly addressed to:

*Bettie J. Carmack*

*501 WAshington Ave*

*Montgomery, Al*

*36130*

Melvin Ray